**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WILLIS FRANKLIN HITCHENS,          )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          Civil Action No. 20-1206-CJB
                                   )
BOARD OF TRUSTEES, PLUMBERS        )
AND PIPEFITTERS LOCAL              )
UNION NO. 74 PENSION FUND,         )
                                   )
          Defendant.               )

---

Gary W. Aber, Wilmington, DE, Attorney for Plaintiff.

Timothy J. Snyder and Jennifer M. Kinkus, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Michael DelTergo, JENNINGS SIGMOND, P.C., Philadelphia, PA, Attorneys for Defendant.

---

**MEMORANDUM OPINION**

September 23, 2022
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

Plaintiff Willis Franklin Hitchens ("Plaintiff") commenced this action against Board of Trustees, Plumbers and Pipefitters Local Union No. 74 Pension Fund ("Defendant") after Defendant allegedly improperly denied Plaintiff's application for pension benefits. Presently before the Court is Defendant's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 (the "Motion"). (D.I. 24) For the reasons set out below, the Court GRANTS the Motion.

## I.    BACKGROUND

### A.    Factual Background

Plaintiff is a resident of Delaware who worked for over 27 years as a plumber/pipefitter for various companies that contracted to perform work at the Delaware Refinery (the "Refinery"). (D.I. 1 at ¶ 1; D.I. 32 at B020 (the "Hitchens Declaration"), at ¶ 2)[1] The Plumbers and Pipefitters Local Union No. 74 Pension Fund (the "Plan") is a multi-employer pension benefit plan as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (D.I. 1 at ¶ 3; D.I. 23 at AR10100) The Plan provides pension benefits to retirees who: (1) worked for employers who had collective bargaining agreements with Plumbers and Pipefitters Local Union No. 74 (the "Union"); and (2) meet the Plan's eligibility

---

[1]    While Defendant objects to the Hitchens Declaration (an issue discussed in further detail below), it does so only as to paragraphs 4-7 and 10 thereof. (D.I. 39 at 2) And so in the Background section of this opinion, the Court will at times cite to other paragraphs from that declaration.

Additionally, the Court will occasionally cite to a portion of Plaintiff's Complaint in this opinion, but it will only do so for clarity's sake and when making reference to factual matters that are not in any real dispute.

criteria for benefits.  (D.I. 1 at ¶ 3)  Defendant administers the Plan.  (*Id.* at ¶ 4)  Plaintiff was a participant in the Plan.  (*Id.* at ¶ 2)

Under the Plan, retirees receive monthly pension payments for the life of the participant and his or her spouse, as appropriate.  (D.I. 23 at AR10044-45)  A Plan participant may commence receiving full retirement benefits upon reaching the Normal Retirement Date (i.e., the last day of the month in which the participant attains the later of:  (a) age 65; or (b) five years of participating in the Plan).  (*Id.* at AR10013-14)  An eligible participant may elect a reduced "Early Retirement" benefit upon attaining the earlier of:  (a) age 60 with 10 years of service; or (b) 25 years of service, irrespective of age.  (*Id.* at AR10010-11)  Finally, a participant is eligible for "Unreduced Early" retirement pension benefits if he or she:  (a) has achieved 30 years of service; or (b) is age 55 with 25 years of service; or (c) is age 62 with ten years of service.  (*Id.* at AR10031)

The Plan provides that pension benefits can be suspended for participants who retire prior to normal retirement age but who nevertheless work after retirement; this will occur if the participant is employed in "Disqualifying Employment[.]"  (*Id.* at AR10065)  "Disqualifying Employment" is defined in Section 7.01(e) of the Plan as follows:

> 7.01(e)  "Disqualifying Employment" is employment (including self-employment) for any length of time, with any employer, including, but not limited to, construction managers, general contractors, contractors, subcontractors and/or any other business entity whose business performs work (including subcontracted work):
>
> (1)     in the plumbing and pipefitting industry; and
>
> (2)     that comes within the work jurisdiction of the Union, the United Association or within the work jurisdiction of any union or Pension Fund with which this Plan maintains a reciprocal agreement, whether or not such employer is a

3

>    party to a collective bargaining agreement with any labor
>    organization; provided, however that a non-bargaining unit
>    position with a Contributing Employer shall not be
>    Disqualifying Employment within the meaning of this
>    provision and provided, further, that employment in a sales
>    or sales assistant position for a building supply retailer or
>    wholesaler (e.g., Home Depot or Lowe's) shall not be
>    considered as disqualifying employment; and
>
> (3)  in addition to, and not in limitation of, the provisions set
>      forth in subparagraphs (1) and (2) above, work for an
>      employer, including but not limited to construction
>      managers, general contractors, contractors and any other
>      form of business entity, shall be disqualifying employment
>      within the meaning of this provision if the employer, in any
>      manner, directly or indirectly, engages in or contracts for
>      the supervision of work in the plumbing and pipefitting
>      industry, even where the actual work will be subcontracted
>      to other companies or business entities.

(*Id.* at AR10064)

In 2008, Plaintiff received and accepted an offer to work as a Maintenance Supervisor for

the maintenance department at the Refinery.[2]  (Hitchens Declaration at ¶ 3)  Plaintiff could not

be a Union member and hold this position, and so in accepting the position, Plaintiff withdrew

from the Union.  (*See* D.I. 1 at ¶ 35; *see also* D.I. 34 at 3)

On April 30, 2019, Plaintiff filed an application with the Union for early pension

benefits.  (D.I. 23 at AR00001)  In the "Working After Retirement Employment Inquiry" portion

of this application, Plaintiff checked the box indicating that he would be working after he retires.

(*Id.* at AR00011)  This portion of the application went on to ask:  "Is this a non-bargaining

position?" (i.e., a non-union position).  (*Id.*; *see also* Tr. at 50)  Instead of checking the provided

---

[2]    The Refinery has been owned by different companies during Plaintiff's
employment there, "most recently Valero, which was later sold to PBF Energy."  (Hitchens
Declaration at ¶ 2)

"Yes" or "No" boxes in response to this question, Plaintiff wrote the following answer by hand: "If I do, [i]t will not be mech. pipefitting/plumbing[.]"  (D.I. 23 at AR00011)

On June 3, 2019, Defendant's members held a meeting during which they discussed Plaintiff's application for benefits.  (*Id.* at AR00016-17)  Then, by letter dated July 29, 2019 (the "July 29 letter"), the Plan's third-party administrator Zenith American Solutions (the "Administrator") informed Plaintiff that his pension benefits had been suspended (and that this suspension would be treated as a "denial of a claim for benefits") because Plaintiff "indicated on [his] application that [he] will be working after [he] retire[s], even though [he] did not indicate whether it was in a bargaining position, and indicated that [he] would be doing plumbing and pipefitting work."  (*Id.* at AR00019-20)  The letter, citing to Section 7.01(e) of the Plan, further stated that an additional reason why Plaintiff's pension benefits were suspended was that "it has come to the attention of the [] Administrator that [Plaintiff was] working in "'Disqualifying Employment.'"  (*Id.* at AR00019)  To the extent that Plaintiff disagreed with the Administrator's determination, the letter directed Plaintiff to, *inter alia*:  (1) request a review by submitting a written appeal within 60 days of receipt of the letter; and (2) submit any "written comments, documents and records that support your claim" along with any appeal.  (*Id.* at AR00020)

On September 11, 2019, Plaintiff's counsel informed the Administrator that he had been retained by Plaintiff in connection with the denial of Plaintiff's claim for benefits, and requested relevant documents.  (*Id.* at AR00037-38)  In response, on September 26, 2019, Defendant's counsel provided Plaintiff's counsel with "a copy of the most recent amended and restated Plan document and amendments, and the Summary Plan Description[,]" along with a copy of Plaintiff's pension application.  (D.I. 39, ex. 1)

On November 1, 2019, Plaintiff's counsel again wrote to the Administrator, this time disputing that Plaintiff's employment as a Maintenance Supervisor constituted "Disqualifying Employment" and requesting reversal of the Administrator's decision to deny Plaintiff benefits (the "November 1 letter" or the "November 1, 2019 appeal").  (D.I. 23 at AR00040-41) Defendant's members treated the November 1 letter as Plaintiff's appeal of Defendant's benefits denial.  (D.I. 25 at 7)

During a December 2, 2019 meeting, Defendant's members considered and ultimately denied Plaintiff's appeal.  (D.I. 23 at AR00045-46)  On February 14, 2020, Defendant's counsel sent a letter to Plaintiff, informing him of this decision (the "February 14 letter").  (*Id.* at AR00050-51)  The February 14 letter explained that the decision was made because Plaintiff was engaged in "Disqualifying Employment" as described in Section 7.01(e), in that, *inter alia*, Plaintiff was "the coordinator of plumbing and pipefitting maintenance for two of the units at the Refinery, which includes overseeing the plumbing and pipefitting work of his former employer." (*Id.*)

Additional relevant facts will be set out as necessary in Section III below.

**B.      Procedural Background**

Plaintiff commenced this action on September 10, 2020.  (D.I. 1)  In his Complaint, Plaintiff sought, *inter alia*:  (1) a declaration that Defendant violated the terms of the Plan by failing to pay Plaintiff early pension benefits; (2) an order requiring Defendant to pay Plaintiff the past and future early pension benefits he is due; and (3) reasonable attorney's fees and costs he incurred in bring this action.  (*Id.* at ¶ 53)

Defendant filed the instant Motion on September 17, 2021.  (D.I. 24)  The Motion was fully briefed as of November 1, 2021.  (D.I. 39)

6

On April 4, 2022, the parties filed a joint notice of consent to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.  (D.I. 44)  The Court then heard argument on the Motion on June 25, 2022.  (D.I. 50 (hereinafter "Tr."))

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Id.* at 587 (internal quotation marks, citation and emphasis omitted).  If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).[3]

---

[3]     Defendant argues that the non-moving party is not entitled to the usual summary judgment-type inferences in ERISA cases.  (D.I. 25 at 8)  However, the United States Court of Appeals for the Third Circuit applies the usual summary judgment standard in such cases. *Patrick v. Reliance Standard Life Ins. Co.*, 527 F. Supp. 3d 689, 697 n.2 (D. Del. 2021) (citing cases); *see also* (D.I. 34 at 6).  In any event, as the Court will discuss below, here there are no genuine disputes of material fact at play.

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Facts that could alter the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is—genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

**B.     ERISA**

ERISA permits a plan participant to bring a civil action in federal court to recover benefits due under the terms of a benefit plan.  29 U.S.C. § 1132(a)(1)(B).  Where, as here, the plan documents at issue grant the administrator discretionary authority to determine eligibility for benefits, courts review a denial of benefits under an arbitrary and capricious standard.  *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011); *Patrick v. Reliance Standard Life Ins.*

8

*Co.*, 527 F. Supp. 3d 689, 697 (D. Del. 2021).[4]  This is a "deferential standard of review[,]"

*Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (internal quotation marks and

citation omitted), under which a reviewing court may overturn an administrator's decision if it is

"without reason, unsupported by substantial evidence or erroneous as a matter of law[,]" *Miller*,

632 F.3d at 845 (internal quotation marks and citation omitted).[5]  Accordingly, a court must

"defer to an administrator's reasonable interpretation of ambiguous plan language, but an

administrator's interpretation may not conflict with the plain language of the plan."  *Patterson v.*

*Aetna Life Ins. Co.*, 763 F. App'x 268, 270-71 (3d Cir. 2019); *see also Duda v. Standard Ins.*

*Co.*, 649 F. App'x 230, 234 (3d Cir. 2016) (noting that the court must "determine whether there

was a reasonable basis for the administrator's decision, based on the facts known at the time the

decision was made").

## III.   DISCUSSION

With its Motion, Defendant asserts that its decision to deny Plaintiff's early pension

benefits in light of Plaintiff's "Disqualifying Employment" was not arbitrary and capricious.

---

[4]     There is no dispute in this case that the Plan documents provide Defendant with broad discretion over the Plan's administration.  (D.I. 25 at 9-10; *see also* D.I. 34 at 2; Tr. at 91)

[5]     This standard is also sometimes described as an "abuse of discretion" standard, and in the ERISA context, the "arbitrary and capricious" and "abuse of discretion" standards of review are "essentially identical."  *Miller*, 632 F.3d at 845 n.2.  The Third Circuit has explained that there are two reasons why this deferential standard of review is applied when the plan document gives the administrator discretionary authority.  First, this gives effect to the plan-drafter's intentions, which is appropriate, in that ERISA abounds with the language and terminology of trust law—and the hallmark purpose of trust law is to accomplish the settlor's intentions.  *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 246 (3d Cir. 2017).  Second, Congress intended to encourage employers to offer ERISA plans; giving deference to the decisions of plan administrators promotes efficiency, predictability and uniformity in the ERISA administration context, which in turn encourages employers to make ERISA plans available in the first place.  *Id.*

(D.I. 25 at 2)  Thus, according to Defendant, there are no triable genuine issues of material fact and Defendant is entitled to judgment as a matter of law with respect to Plaintiff's claim.  (*Id.* at 3)

Plaintiff, for his part, retorts that Defendant's interpretation of "Disqualifying Employment" is without logic or reason.  (D.I. 34 at 11-14)  It also contends that Defendant's procedural handling of Plaintiff's appeal amounts to arbitrary and capricious conduct.  (*Id.* at 7-11, 15-22)  The Court will take up these arguments in turn below.

### A.     Defendant's Determination that Plaintiff's Employment was "Disqualifying Employment"

The Court finds that Defendant's determination that Plaintiff's employment constituted "Disqualifying Employment" was not arbitrary and capricious.  In reaching this conclusion, the Court will first explain why Defendant's interpretation of how Section 7.01(e)'s subsections work together to define "Disqualifying Employment" is supported by the plain language of the Plan.  The Court will then explain why the administrative record supports Defendant's conclusion that Plaintiff was, in fact, engaged in "Disqualifying Employment" under the meaning given that term in Section 7.01(e)(3).

### 1.     How Section 7.01(e)'s Subsections Relate to Each Other with Regard to the Definition of "Disqualifying Employment"

As an initial matter, the parties dispute whether the requirements of Section 7.01(e)(1), Section 7.01(e)(2) and Section 7.01(e)(3) must *all* be satisfied in order for a position to count as "Disqualifying Employment."  In his briefing, Plaintiff argues that because the word "and" comes at the end of Sections 7.01(e)(1) and 7.01(e)(2), then employment must meet the requirements found in all three subsections (i.e., 7.01(e)(1), 7.01(e)(2) and 7.01(e)(3)) in order to constitute "Disqualifying Employment."  (*Id.* at 11-12, 14)  Meanwhile, Defendant contends that

if employment meets the requirements described in 7.01(e)(3), then that is enough to constitute "Disqualifying Employment." (D.I. 25 at 13)  In other words, according to Defendant, Section 7.01(e)(3) spells out a separate basis for a finding of "Disqualifying Employment"—one that is independent of Sections 7.01(e)(1) and 7.01(e)(2) and that, if satisfied, ends the inquiry. (*Id.*; Tr. at 25, 29-32, 62)

To be sure, Section 7.01(e) is not artfully drafted. (Tr. at 30, 43, 86)  And when a term is defined in multiple contractual subsections, with each of those subsections being joined together by the word "and," then one might initially think that the section as a whole should be read in the conjunctive. (*Id.* at 85-86); *see also, e.g.*, *Stolte v. Securian Life Ins. Co.*, Case No. 21-cv-07735-DMR, 2022 WL 3357839, at *5 (N.D. Cal. Aug. 15, 2022) ("The [eligibility] requirements [for group life insurance coverage] are written in the conjunctive, meaning that all four elements must be satisfied to establish eligibility.").  But here, as Defendant argues, any such initial presumption is quickly set aside after reading the actual wording of Section 7.01(e)(3).  Section 7.01(e)(3) states that "work for an employer, including but not limited to construction managers, general contractors, contractors and any other form of business entity, *shall be disqualifying employment* within the meaning of this provision" if certain other conditions set out therein are met. (*Id.* (emphasis added))  In other words, here Section 7.01(e)(3) is pretty directly telling the reader: "No matter what we have said before this in the prior portions of Section 7.01(e), if a person's work for an employer is of the type that we are about to describe, then that work will amount to 'Disqualifying Employment.'"

Moreover, even if there was some ambiguity as to whether Defendant's position was correct, Defendant would still prevail on this point.  That is because Defendant's argument about how the subsections of Section 7.01(e) work together is at least a *reasonable* one.  Indeed, during

11

oral argument, Plaintiff's counsel seemed to acknowledge that Section 7.01(e) is at least "ambiguous" with regard to whether all three subsections must be satisfied.  (Tr. at 85; *see also id*. at 91)

Despite this, Plaintiff's counsel asserted that if the Plan language at issue was ambiguous, then the "standard rules of [interpreting] contract[s]" should apply—whereby any ambiguity should be "construed against" Defendant.  (*Id*. at 86; *see also id*. at 91)  Yet Plaintiff is incorrect on that front.  As noted above, where the "arbitrary and capricious" standard applies in the ERISA context (as it does here), a court must "defer to an administrator's reasonable interpretation of ambiguous plan language[.]"  *Patterson*, 763 F. App'x at 270-71; *see also Fleisher*, 679 F.3d at 123-24 (rejecting the notion that ambiguous terms of an insurance policy governed by ERISA should be construed against the drafter in accordance with general principles of contract law, as this would misapprehend the nature of an abuse of discretion standard of review, whereby deference is given to an administrator's reasonable interpretation of an ambiguous term).  Defendant's interpretation of Section 7.01(e)(3) as being a stand-alone basis for demonstrating "Disqualifying Employment" is, at a minimum, not unreasonable. Therefore, the Court must defer to this interpretation.  (Tr. at 24); *Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 248 (3d Cir. 2017) ("[W]hen granting deference we do not demand the *best* interpretation, only a reasonable one[.]") (emphasis in original) (internal quotation marks and citation omitted).

## 2. Whether Substantial Evidence Supports Defendant's Conclusion that Plaintiff Participated in "Disqualifying Employment"

Having now determined that Defendant's interpretation of how Section 7.01(e)(3) works (i.e., that it provides for an independent definition of "Disqualifying Employment") is at least

reasonable, the Court next considers whether substantial evidence supports Defendant's conclusion that Plaintiff's employment actually met this definition.  As noted above, Section 7.01(e)(3) provides that "Disqualifying Employment" occurs when a plan participant "work[s] for an employer, including but not limited to construction managers, general contractors, contractors and any other form of business entity . . . if the employer, *in any manner, directly or indirectly, engages in or contracts for the supervision of work in the plumbing and pipefitting industry*, even where the actual work will be subcontracted to other companies or business entities."  (D.I. 23 at AR10064 (emphasis added))

From there, Defendant's analysis is pretty straightforward.  (D.I. 25 at 13-14)  It is undisputed that Plaintiff was a supervisor at the Refinery.  (*Id.* at 13; D.I. 1 at ¶¶ 15-28; D.I. 39 at 8 n.5)  And it is also undisputed that in this position, Plaintiff—at some level—supervised plumbers and pipefitters who worked at the Refinery.  (*See, e.g.*, D.I. 25, ex. 1 ("Hackendorn Decl.") at ¶¶ 4-9; D.I. 34 at 14; Tr. at 4-5, 35; *see also* D.I. 1 at ¶ 29)  Indeed, Michael Hackendorn, a Trustee of Defendant, notes in a declaration that at all relevant times he "worked [at the Refinery] as a plumber/pipefitter" and that when he did so, he was personally "under the supervision of Plaintiff[.]"  (Hackendorn Decl. at ¶¶ 4-9)  Thus, Defendant argues, "the record in this matter shows that Plaintiff supervised work in the plumbing and pipefitting industry [and so] Plaintiff has engaged in Disqualifying Employment[.]"  (D.I. 25 at 13-14; *see also* Tr. at 9)

Plaintiff's main argument in response is that his employment still does not satisfy Section 7.01(e)(3)'s definition of "Disqualifying Employment" because Plaintiff (and thus, his employer) did not *directly* supervise plumbers and pipefitters at the Refinery.  (D.I. 34 at 14; Tr. at 87-88)  In support, Plaintiff submitted his own declaration and a declaration of his supervisor at the Refinery, Michael Mattera.  (Hitchens Declaration; D.I. 38-1)  In these declarations, Plaintiff and

13

Mr. Mattera state that as a Maintenance Supervisor, Plaintiff was not permitted to "deal directly" with any plumbers or pipefitters; instead, if there was an issue with a plumber's or a pipefitter's work at the Refinery, Plaintiff would raise that issue with the Refinery's Construction Manager, Nooter Construction ("Nooter").  (Hitchens Declaration at ¶¶ 6-7; D.I. 38-1 at ¶ 6)  Plaintiff and Mr. Mattera also state that Plaintiff himself never did any physical plumbing or pipefitting work, (Hitchens Declaration at ¶ 7; D.I. 38-1 at ¶¶ 5, 8), and that Plaintiff only interacted with a craftsman's job performance with respect to "matters of safety[,]" (D.I. 38-1 at ¶ 6).  In light of this, Plaintiff argues that the requirements of Section 7.01(e)(3) are not satisfied.  (Tr. at 86-90; *see also* D.I. 34 at 5, 14)

In assessing this argument, the Court must first address an introductory matter: Defendant's contention that Plaintiff's declaration and Mr. Mattera's declaration should be disregarded, in light of the appropriate standard of review.  (D.I. 39 at 1-2 & n.2; Tr. at 9-10) More specifically, Defendant argues that:  (1) pursuant to the arbitrary and capricious standard, the Court must review the administrator's decision "using only the evidence available to" the administrator at the time that it made the decision, *Patrick v. Reliance Standard Life Ins. Co.*, Civil Action No. 15-169-SLR-SRF, 2016 WL 4573877, at *7 (D. Del. Aug. 31, 2016), *report and recommendation adopted by* 2016 WL 5662138 (D. Del. Sept. 29, 2016); *see also Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the plan administrator *which cannot be supplemented during litigation*.") (emphasis added); and (2) the cited information in Plaintiff's and Mr. Mattera's declarations were not, in fact, before the Administrator at the time it made the relevant benefit denial decisions, (D.I. 39 at 1).

14

Defendant is correct.  What Plaintiff and Mr. Mattera assert in their declarations—i.e., alleged facts describing the particular responsibilities that Plaintiff did or did not have vis-à-vis the work of the Refinery's plumbers and pipefitters—was not information available to the Administrator when it made the decisions at issue in 2019 and 2020.  Thus, it would not be appropriate for the Court to consider those facts here.[6]

However, the Court notes that even if it could consider these two declarations, the ultimate outcome would be the same.  (*See* Tr. at 9-10, 35-37)  That is because the plain language of Section 7.01(e)(3) is very broad.  The subsection encompasses work for an employer if the employer "in *any manner*, directly *or indirectly*, *engages in* . . . the supervision of work in the plumbing and pipefitting industry, even where the actual work will be subcontracted to other companies or business entities."  (D.I. 23 at AR10064 (emphasis added))  While Plaintiff seems to focus on the fact that he did not *directly* supervise plumbers and pipefitters, (D.I. 34 at 5, 14; Tr. at 88-90), the language of Section 7.01(e)(3) is not limited to direct supervision.  Indeed, it expressly includes *indirect* supervision.  And it is clear—even from Plaintiff's own Complaint and declarations—that Plaintiff worked for an employer (the Refinery) that was, at minimum,

---

[6]      It is true that along with its briefing, Defendant submitted a declaration of its own: Mr. Hackendorn's declaration.  (D.I. 25, ex. 1)  But in his briefing, Plaintiff did not argue that Mr. Hackendorn's declaration should be disregarded because it contains facts that were unavailable at the time of Defendant's decision.  (*See* D.I. 34)  (Plaintiff instead wrongly argues that Mr. Hackendorn's declaration "is bereft of any facts" and contains only conclusions.).  (Tr. at 67)  And in contrast to the declarations submitted by Plaintiff, Mr. Hackendorn's declaration describes the information that Defendant *actually considered* when deciding to deny Plaintiff's early pension benefits.  (*See* D.I. 25, ex. 1 at ¶ 11 ("I advised the Trustees that I was personally aware that Plaintiff was working in the plumbing and pipefitting industry and supervising plumbers and pipefitters performing work at the Refinery[.]"); D.I. 34 at 4-5 (Plaintiff noting that at the December 2, 2019 Board meeting, Mr. Hackendorn described his personal observations to the Board); Tr. at 9, 67)  Thus, consideration of Mr. Hackendorn's declaration does not run afoul of the requirements of the relevant standard of review.

indirectly engaged in the supervision of the work of plumbers and pipefitters.  Indeed, Plaintiff

explains how he himself engaged in that very type of indirect supervision on the Refinery's

behalf.  He was required to be aware of how the plumbers and pipefitters did their work at the

Refinery.  And if there was a problem or concern with that work, then he would address the issue

with Nooter (the entity that he says directly managed the plumbers and pipefitters).[7]

Thus, there is substantial evidence to support Defendant's conclusion that Plaintiff's

employment was "Disqualifying Employment" pursuant to Section 7.01(e)(3).  For these

reasons, Defendant's determination to suspend Plaintiff's pension benefits on this ground was

not arbitrary or capricious.[8]  *See, e.g.*, *Gonzalez v. Local 553 Pension Fund*, 16 Civ. 8893 (LGS),

---

[7]    In his briefing, Plaintiff also appears to be making a second argument as to why his employment did not satisfy the definition of "Disqualifying Employment" set out in Section 7.01(e)(3):  that even if Plaintiff's employer does supervise the work of plumbers and pipefitters, that supervision is not "of work in the plumbing and pipefitting industry" since the Refinery is in the oil refining industry, not the plumbing or pipefitting industry.  (D.I. 34 at 13)  In Plaintiff's view, "work in the plumbing and pipefitting industry" means work for a company "[w]hose . . . reason for being in existence" is to perform plumbing and pipefitting work.  (Tr. at 82)

This additional argument does not change the outcome.  On the one hand, Plaintiff's interpretation (i.e., that Section 7.01(e)(3) must refer to supervision of work performed by a company whose sole reason for existence is to do plumbing and pipefitting work—e.g., a plumbing company) could indeed be a reasonable one.  But on the other hand, it strikes the Court as also reasonable that Section 7.01(e)'s drafters intended that employment for a company that supervises plumbers and pipefitters—even if the company's central focus was on a different business endeavor (e.g., refining oil)—should be covered.  In other words, it seems reasonable that Defendant and the Union might not have wanted former union members to receive early retirement benefits if their company supervised plumbers or pipefitters, as a company that engaged in that work could potentially "tak[e] jobs away from union people" or have "a direct impact on union work[.]"  (Tr. at 32-34)  And so long as Defendant's interpretation is reasonable, it cannot be arbitrary and capricious.

[8]    Defendant also asserts that Plaintiff's employment constituted "Disqualifying Employment" pursuant to Section 7.01(e)(1).  (D.I. 25 at 11)  Plaintiff disagrees.  (D.I. 34 at 12)  The Court need not address this issue, however, in light of its conclusion that Section 7.01(e)(3) provides a stand-alone definition of "Disqualifying Employment" that encompassed Plaintiff's work.

2017 WL 3242329, at *4-5 (S.D.N.Y. July 28, 2017) (finding that the defendant's determination that the plaintiff was engaged in disqualifying employment was supported by the facts and evidence, including by the plaintiff's own statements, and that plaintiff's argument to the contrary "flatly contradict[ed]" the plain language of the plan); *Lynch v. Sheet Metal Workers' Nat'l Pension Fund*, No. 08-CV-0542HKS, 2010 WL 5333689, at *7 (W.D.N.Y. Dec. 20, 2010) (finding that the defendant's determination that the plaintiff was engaged in disqualifying employment under the terms of the plan was not arbitrary and capricious, where it was based on plaintiff's description of his employment).

### B.     Defendant's Procedural Handling of Plaintiff's Appeal

Next, Plaintiff argues that—separate and apart from whether Defendant's determination that Plaintiff engaged in "Disqualifying Employment" was reasonable—Defendant's procedural handling of Plaintiff's appeal amounted to arbitrary and capricious conduct.  (D.I. 34 at 2, 7-11, 15-22)  More specifically, Plaintiff contends that Defendant engaged in a number of ERISA-related procedural violations, when it failed to:  (1) notify Plaintiff of his right to a hearing before the Board; (2) provide Plaintiff with the facts upon which Defendant's decision was based; and (3) advise Plaintiff as to what materials or information would be necessary to perfect his claim. (*Id.* at 7-11, 15-22)[9]

---

Similarly, Defendant contends that Plaintiff's benefits were also suspended because he failed to properly disclose his employment as Maintenance Supervisor in his application for early pension benefits.  (D.I. 25 at 14-15)  Plaintiff responds by asserting that this argument should be deemed waived.  (D.I. 34 at 22-23)  Here again, in light of the Court's conclusion with respect to Section 7.01(e)(3), it is not necessary to address this argument.

[9]      In addition to referring to these deficiencies as "procedural" violations, Plaintiff asserts that—at least with respect to Defendant's failure to notify Plaintiff of his right to a hearing—this constituted a breach of a fiduciary duty that Defendant owed to Plaintiff.  (D.I. 34 at 7-11)  Whether Plaintiff's allegations here are rightly considered to be ERISA "procedural"

ERISA and corresponding regulations set forth basic procedural requirements governing ERISA plans, requiring that every plan must:  "(1) provide adequate notice in writing to any participant . . . whose claims for benefits . . . has been denied, setting forth the specific reasons for such denial[;]" and (2) "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review[.]"  29 U.S.C. § 1133 ("Section 503"); *see also* 29 C.F.R. § 2560.503-1 (the "Claims Procedure Regulation"); *Miller*, 632 F.3d at 850.  A plan administrator's compliance with Section 503 in deciding to deny benefits is probative of whether the decision was arbitrary and capricious.  *Miller*, 632 F.3d at 851; *see also Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Cos.*, 644 F. App'x 205, 213 (3d Cir. 2016) (noting that procedural irregularities are factors to consider in determining if the plan administrator's interpretation was reasonable).

Procedural defects should not upset the determination of a plan administrator if the administrator is in substantial compliance with Section 503.  *Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177, 194 (D. Del. 2011); *Russell v. Paul Revere Life Ins.*

---

violations, or "breaches of fiduciary duty" (or both), it is notable that nowhere in the Complaint did Plaintiff explicitly refer to these concepts.  (D.I. 1; Tr. at 94-96)  And while some courts seem to conclude that arguments asserting procedural violations by a plan administrator are implicitly subsumed within a claim for wrongful denial of ERISA benefits, *see, e.g.*, *Greer v. Operating Eng'rs Local 324 Pension Fund*, Case No. 17-11832, 2017 WL 3891785, at *3 (E.D. Mich. Sept. 6, 2017); *see also Sankey v. Hartford Life & Accident Ins. Co.*, Case No. 2:09-cv-070, 2010 WL 11639830, at *5 (S.D. Ohio Nov. 1, 2010), there are certainly plenty of examples of ERISA plaintiffs making such allegations in separate, stand-alone counts in a complaint, *see, e.g.*, *Rol-Hoffman v. Reg'l Care, Inc.*, 540 F. Supp. 3d 1027, 1036 (D. Colo. 2021); *Gilmour Tr. for Grantor Trusts of Victory Parent Co., LLC v. Aetna Health, Inc.*, SA-17-CV-00510-FB, 2020 WL 3184365, at *2 (W.D. Tex. June 12, 2020).

In any event, even if Defendant could have argued that these claims are not really a part of this case because they were never mentioned in the Complaint, Defendant did not take that tact here.  Instead, Defendant addressed these arguments on the merits.  (Tr. at 55)  And so the Court will assume that Plaintiff's procedural violation/breach of fiduciary duty arguments are properly in the case, and will discuss them herein.

*Co.*, 148 F. Supp. 2d 392, 410 (D. Del. 2001), *aff'd*, 288 F.3d 78 (3d Cir. 2002); *see also Mirza v. Ins. Adm'r of Am., Inc.*, 800 F.3d 129, 136 (3d Cir. 2015).  Under the substantial compliance standard, "technical noncompliance with ERISA procedures will be excused so long as the purposes of [Section 503] have been fulfilled."  *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006) (internal quotation marks, brackets and citation omitted).  Section 503 operates to provide claimants with adequate information to ensure effective judicial review. *Mirza*, 800 F.3d at 136.  A notice of denial of benefits is substantially complaint with ERISA regulations if it provides a "statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review."  *Morningred*, 790 F. Supp. 2d at 194 (internal quotation marks and citations omitted); *see also Potts v. Hartford Life & Accident Ins. Co.*, 272 F. Supp. 3d 690, 715 (W.D. Pa. 2017).[10]

Having set out the relevant law, the Court will now address each of the three alleged procedural violations cited by Plaintiff.

### 1. Defendant's Alleged Failure to Notify Plaintiff of His Right to Request a Hearing

First, Plaintiff asserts that Defendant improperly failed to notify him of his right to request a hearing; as a result, he argues that he was unable to explain at a hearing his "role working for [the Refinery—i.e.,] that he was not permitted to *directly* instruct[] or control Union members, except in emergency safety situations."  (D.I. 34 at 10-11 (emphasis added))  In making this argument, Plaintiff points out that Section 9.04 of the Plan requires:

> This notice [of denial of benefits] will include a statement that the person whose claim has been denied has a right within sixty (60)

---

[10]     Generally, the remedy for a violation of Section 503 is remanding the action to the plan administrator in order for the claimant to get the benefit of a full and fair review.  *Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir. 2000).

> days of written notification of claim denial to request a hearing
> before the Board of Trustees or a committee thereof for the
> purpose of carrying out a full and fair review of the claim denial.

(D.I. 23 at AR10075 (*cited in* D.I. 34 at 7)); *see also* 29 C.F.R. § 2560.503-1(h)(2)(iii) (requiring

a Plan to provide to provide to the claimant "all documents, records, and *other information*

relevant to the claimant's claim for benefits") (*cited in* D.I. 34 at 8) (emphasis added); 29 C.F.R.

§ 2560.503-1(g)(1)(iv) (requiring a notification of benefits determination to include a description

of the plan's review procedures) (*cited in* D.I. 34 at 10).

Defendant's July 29 letter (i.e., the letter that first informed Plaintiff of the denial of

benefits) did in fact explicitly reference Section 9.04 when it stated: "If you disagree with this

determination, under Section 9.04 of the Plan (copy attached), you may request a review by

submitting a written appeal to the Board of Trustees, which must be received in this office no

later than 60 days after you receive this notification." (D.I. 23 at AR00020) However, the July

29 letter does not specifically refer to a right to a "hearing." And though the letter asserted that a

copy of the Plan was attached to it, that was incorrect; Defendant acknowledges that it made a

mistake and forgot to include the Plan as an attachment. (D.I. 39 at 3; Tr. at 52) Nevertheless,

Defendant contends that none of these facts provide a basis for relief for Plaintiff because: (1)

on September 11, 2019, Plaintiff's counsel requested Plan documents from Defendant; (2)

Defendant's counsel thereafter provided Plaintiff with the requested materials (including Section

9.04) on September 26, 2019; and (3) Plaintiff never requested a hearing from Defendant

thereafter. (D.I. 39 at 3-5 & n.4; *id.*, ex. 1; *see also* D.I. 23 at AR00037-38; Tr. at 53, 107-08)

The Court agrees with Defendant. The July 29 letter's failure to notify Plaintiff of the

right to request a hearing was undisputedly a procedural defect. But Defendant otherwise

substantially complied with its duty to notify Plaintiff of this right. (D.I. 39 at 3-4)

After all, the substantial compliance test "considers *all communications*" between the plan participant and administrator, in order to determine whether the information provided was sufficient under the circumstances. *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (emphasis added) (internal quotation marks and citation omitted). If claim communications as a whole are sufficient to satisfy the purposes of Section 503, then the claim decision should be upheld, even if one particular communication did not meet Section 503's requirements. *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996). Here, by expressly referencing Section 9.04 in the July 29 letter, Defendant signaled to Plaintiff and his counsel that this Plan provision was important. And even though Defendant failed to include a copy of Section 9.04 along with the July 29 letter, Defendant's counsel thereafter did send a copy of the Plan (including Section 9.04) to Plaintiff's counsel. Indeed, during oral argument, Plaintiff's counsel acknowledged that he received those Plan documents, and that "technically as an attorney [Section 9.04's notice of the right to request a hearing] probably should not have gotten past" him. (Tr. at 69-75)

Therefore, looking at the record as a whole, Defendant provided Plaintiff sufficient information about his right to request a hearing.[11] Defendant thus cannot be blamed for Plaintiff's failure to do so thereafter.

---

[11]        The Court notes that the Plan facially requires that if a participant wishes to request a hearing, the person has to do so within 60 days of written notification of claim denial. (D.I. 23 at AR10075) This 60-day period would have expired on September 27, 2019 (i.e., 60 days from July 29, 2019), which is the day after Defendant provided the relevant Plan documents to Plaintiff. (D.I. 39, ex. 1) One could thus argue that it would have been nearly impossible for Plaintiff to request a hearing in a timely manner, in light of this timeline. Yet Plaintiff's November 1, 2019 appeal was filed well after the 60-day deadline, and Defendant still considered that appeal on the merits. (D.I. 25 at 7) And so it is reasonable to presume that Defendant would have considered an untimely request for a hearing in these circumstances too. (*See* Tr. at 53-54)

###### 2.     Defendant's Alleged Failure to Provide Plaintiff with the Facts Upon Which Defendant's Decision was Based

Plaintiff's second "procedural" argument is that Defendant failed to provide him with the actual facts upon which Defendant's decision was based—and that this, in turn, prevented Plaintiff from having a full and fair review of the denial of his benefits.  (D.I. 34 at 2, 11, 20-21; Tr. at 66, 75)  To this charge, Defendant retorts that the July 29 letter provided all of the required information; it argues that Plaintiff's subsequent appeal—in which Plaintiff "mounted a fulsome argument in response"—demonstrates that he had a robust understanding of the relevant facts and issues.  (D.I. 39 at 5-7; *see also* Tr. at 57)

The Claims Procedure Regulation sets out what is required by a notice of denial of benefits.  29 C.F.R § 2560.503-1(g)(1)(i)-(iv).  As relevant to this argument, a notice of denial benefits must include:  (1) the specific reason(s) for the adverse determination; and (2) reference to the specific plan provisions on which the determination is based.  *Id.*

Here, the July 29 letter identified that benefits were denied because, *inter alia*, "it has come to the attention of the Plan Administrator that [Plaintiff is] currently working in 'Disqualifying Employment.'"  (D.I. 23 at AR00019)[12]  The July 29 letter also identifies Section 7.01(e) as the Plan provision on which the determination was based.  (*Id.*)

---

[12]     As previously noted, the July 29 letter also advised that Plaintiff's pension benefits were suspended for a second reason:  i.e., because Plaintiff indicated on his application that he "would be doing plumbing and pipefitting work."  (D.I. 23 at AR00019)  This is an incorrect statement.  In fact, Plaintiff's application for benefits stated that if he were to work after retirement "[i]t will *not* be mech. pipefitting/plumbing[.]"  (*Id.* at AR00011 (emphasis added); *see also id.* at AR00040; Tr. at 50-51)  However, the July 29 letter makes clear that there was also an "addition[al]" reason for the suspension of benefits:  that Plaintiff's current work was deemed to be "Disqualifying Employment."  That second reason (as noted above) was well supported by the record, and so this error in the July 29 letter is harmless.

Plaintiff raises a fair point regarding the sufficiency of the July 29 letter.  The letter clearly could have identified the *particular facts and circumstances* that were brought to the attention of Defendant, which in turn led to the determination that Plaintiff was "currently working in 'Disqualifying Employment.'"  But it did not.  So on this point, the letter can be said to have been unduly conclusory.  *See, e.g.*, *Miller*, 632 F.3d at 852 ("The language in the letter is more akin to the conclusory statements in [certain cases], where the plan administrator summarily concluded that the claimant was ineligible, or that the evidence received did not support the claim without providing further factual support.").

That said, it does not seem that this deficiency prohibited Plaintiff from having a sufficiently clear understanding of the Administrator's position—i.e., that Plaintiff, in light of the work he was performing at the Refinery, was engaged in "Disqualifying Employment" pursuant to Section 7.01(e).  Plaintiff's counsel's initial responsive letter on September 11, 2019 did not ask Defendant to provide any further facts supporting the "Disqualifying Employment" conclusion; instead, that letter simply requested relevant documents.  (D.I. 23 at AR00037-38)  And Plaintiff's counsel's subsequent November 1 letter expressed no confusion about the factual basis upon which Defendant's decision rested.  Instead, in that November 1 letter, Plaintiff's counsel articulated Plaintiff's contrary view as to why his employment did not meet Section 7.01(e)(1) and 7.01(e)(3)'s definition of "Disqualifying Employment."  (*Id.* at AR00041 (Plaintiff's counsel asserting, *inter alia*, that the Refinery "does [not] supervise" plumbers and pipefitters and that the Refinery simply instructs those persons to perform their work in a timely manner))  Thus, this does not appear to be a situation in which the July 29 letter's shortcomings caused Plaintiff harm in seeking review of Defendant's decision.  *See, e.g.*, *Siebert v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 496 F. Supp. 3d 1152, 1164-65 (N.D. Ill. 2020)

(rejecting the plaintiff's argument that the defendant's notice of denial of benefits, which stated little more than plaintiff had not met the relevant requirement of the plan, justified relief, where it was clear from the documents that the plaintiff "was not harmed from the defect because he knew and understood the basis for the decision and ran into no real difficulty challenging it, apart from the fact that the decisions ultimately went against him on the merits"); *Dennis v. Bd. of Trustees of Food Emp'rs. Labor Relations Ass'n*, 620 F. Supp. 572, 576 (M.D. Pa. 1985) (concluding that plaintiff's procedural objection regarding the defendant's suspension of benefits notification was "technical" and did not warrant reinstatement of benefits, where plaintiff's counsel's responsive letter seeking reconsideration of the defendant's decision "clearly indicates plaintiffs' knowledge of why benefits were denied and sets forth fully plaintiffs' arguments for reinstatement"); *see also* (Tr. at 75-76).

Moreover, some courts have explained that even if a plan administrator's denial could be said to violate ERISA's Section 503 notice requirements, if a remand would be a useless formality, then remanding the case is not required. *See Barnes v. AT&T Pension Benefit Plan – Nonbargained Program*, No. C-08-4058 EMC, 2012 WL 1657054, at *6 (N.D. Cal. May 10, 2012) (citing cases); *see also, e.g.*, *Clark v. CertainTeed Salaried Pension Plan*, 860 F. App'x 337, 340 (5th Cir. 2021) ("Even assuming that [the plan administrator] acted improperly . . . no amount of review can change the fact that Clark is ineligible for benefits under the plain terms of the [ p]lan.  In other words, remanding Clark's benefits here would be a useless formality.") (internal quotation marks and citation omitted); *Blanch v. Chubb & Sons, Inc.*, Civil No. CCB-12-1965, 2017 WL 2361088, at *3 (D. Md. May 31, 2017) ("Where, as here, remand would be a 'useless formality' that would generate the same outcome, courts enter judgment for the defendant ERISA plan rather than waste parties' resources with such a futile remedy.") (citation

24

omitted).  Such a result makes sense, because otherwise "allowing a claim for relief because of inadequacy of formal notice without any showing that a precisely correct form of notice would have made a difference would result in benefit claims outcomes inconsistent with ERISA['s] aims of providing secure funding of employee benefit plans."  *Siebert*, 496 F. Supp. 3d at 1165 (quoting *Terry v. Bayer Corp.*, 145 F.3d 28, 29 (1st Cir. 1998)).

Here, even if Defendant's cursory explanation for its conclusion regarding "Disqualifying Employment" violated Section 503, any remand on that basis to the Administrator would be futile.  That is because, as explained above in Section III.A, even considering Plaintiff's own description of his employment at the Refinery, it fell within a reasonable interpretation of Section 7.01(e)(3)'s definition of "Disqualifying Employment."

### 3. Defendant's Alleged Failure to Advise Plaintiff of What Materials or Information Would Be Necessary to Perfect His Claim

Plaintiff's third and final argument regarding procedural violations is that Defendant failed to advise Plaintiff what materials or information would be necessary to perfect his claim. (D.I. 34 at 17; Tr. at 100)  The Claims Procedure Regulation requires that a notice of denial of benefits must include, *inter alia*, a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material and information is necessary[.]"  29 C.F.R § 2560.503-1(g)(1)(iii).

Defendant's July 29 letter did inform Plaintiff to "submit any written comments, documents and records that support your claim, even if not considered in the initial benefit denial[.]"  (D.I. 23 at AR00020)  But Plaintiff nevertheless faults Defendant for failing to elaborate as to what *specific* materials Plaintiff should submit, such as Plaintiff's "job description, communications, witness statements attesting to what type of work he did, and did

not do, or statements from his [] employer[.]"  (D.I. 34 at 17)  Defendant, in response, contends

that the primary relevant fact here was Plaintiff's employment as a supervisor at the Refinery,

and that Plaintiff's position wrongly "presupposes that there is material or information that

Defendant [would have known, when it sent the July 29 letter, that] Plaintiff could [have]

provide[d] to perfect his claim."  (D.I. 39 at 7; *see also* Tr. at 105)

The Court disagrees with Plaintiff that there was a procedural violation here.  As noted

above, Plaintiff's counsel's November 1 letter demonstrated a strong understanding of the

primary issue regarding the claim denial.  And if (for example) Plaintiff or his counsel had

actually been in possession of a job description or a witness statement that would have

successfully contradicted the basis for Defendant's decision, then the July 29 letter's invitation to

submit "any written comments, documents and records that support your claim" seems like it

would have reasonably prompted submission of those types of documents along with any appeal.

For this reason, in the Court's view, the July 29 letter was at least in substantial compliance with

this aspect of the Claims Procedure Regulation.  *See, e.g.*, *Mazur v. Hartford Life & Accident

Co.*, Civil Action No. 06-01045, 2007 WL 4233400, at *14 (W.D. Pa. Nov. 28, 2007) (rejecting

plaintiff's argument that a termination letter failed to describe what additional material or

information was needed to establish plaintiff's disability, where "[d]uring the pendency of the

appeal process, Mazur was represented by counsel having at least some familiarity with what is

required to establish continuing disability. . . . While it is true that Hartford's letter did not

identify the precise evidence that would negate its initial termination decision, it was not

required to do so").

Moreover, even if the Court is incorrect on this point and the July 29 letter did violate Section 503 and 29 C.F.R § 2560.503-1(g)(1)(iii), then for the reasons set out above, any remand on this basis would be futile.

### 4.  Conclusion

Plaintiff has not demonstrated that any technical noncompliance with Section 503 impacted his ability to have effective review of his benefits claim (nor would it change the ultimate outcome here).  Thus, the Court finds that Plaintiff's arguments regarding procedural violations do not warrant relief.  *See Siebert*, 496 F. Supp. 3d at 1166.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion should be GRANTED.  An appropriate Order will issue.